IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | |
|---|---|
| BEAUMONT CHAPTER OF THE NAACP and JESSICA DAYE,<br><br>Plaintiffs,<br><br>v.<br><br>JEFFERSON COUNTY, TEXAS and JEFFERSON COUNTY COMMISSIONERS COURT, LAURIE LEISTER, in her official capacity as the JEFFERSON COUNTY CLERK, and MARY BETH BOWLING, in her official capacity as the PRESIDING JUDGE OF THE JOHN PAUL DAVIS COMMUNITY CENTER,<br><br>Defendants. | Civil Action No. 22 Civ. 488 |

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND EMERGENCY DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Beaumont Branch of the NAACP and Jessica Daye, by and through counsel, file this complaint for declaratory and injunctive relief against Defendants Jefferson County; Jefferson County Commissioners Court; Laurie Leister, Jefferson County Clerk; and Mary Beth Bowling, presiding judge of the John Paul Davis Community Center, and allege upon information and belief as follows:

**INTRODUCTION**

1. All Texas voters have the right to vote free from intimidation. Tex. Elec. Code § 62.0115(b)(2) ("a voter has the right to (2) vote in secret and free from intimidation"). Indeed, this right is a foundational principle of a democratic society. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) ("[T]he right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights.").

1

2. The John Paul Davis Community Center (the "Community Center"), located at 3580 E. Lucas Drive, Beaumont, TX 77703, is one of the voting locations in Beaumont that serves a predominantly Black community. It is in the heart of the North End of Beaumont surrounded by Black churches and other organizations that are strongholds in the community. The Community Center is a place of gathering for children, churchgoers, and other community members.

3. In addition to being a place of gathering, the Community Center is also a voting location. Many of the local churches, including the Borden Chapel Missionary Baptist Church, host souls-to-the-polls events and transport voters to the Community Center. About ninety percent of those who vote at the Community Center are Black, and around 10 percent are White.

4. This year, there has been a remarkable shift in the way voting has been conducted at the Community Center—namely, (i) White poll workers throughout early voting repeatedly asked in aggressive tones only Black voters and not White voters to recite, out loud within the earshot of other voters, poll workers, and poll watchers, their addresses, even when the voter was already checked in by a poll worker, (ii) White poll workers and White poll watchers followed Black voters and in some cases their Black voter assistants around the polling place, including standing two feet behind a Black voter and the assistant, while the voter was at the machine casting a ballot, and (iii) White poll workers helped White voters scan their voted ballots into voting machines but did not similarly help Black voters scan their ballots.

5. Despite these actions being relayed to the Jefferson County clerk, no action was taken to remove Defendant Bowling, who has been responsible for carrying out these practices and enabling this type of conduct, from the Community Center.

6. Defendant presiding judge Bowling and elections clerks supervised by Defendant Bowling have actively deprived Black voters, including the Plaintiff Daye and the members of

Plaintiff Beaumont Branch of the NAACP, of their fundamental right to vote free from intimidation, harassment, threats, and other forms of coercion. Not only that, Defendant Bowling and election clerks under her direction have intentionally treated Black voters differently than White voters.

7. This Court must act immediately and declare the aforementioned conduct a violation of Section 11(b) of the Voting Rights Act (52 U.S.C. § 10101(b)) and the Fourteenth and Fifteenth Amendments to the United States Constitution, which prohibit treating one group differently from another on account of race.

8. This Court must intervene. Without this Court's immediate intervention, Defendants will continue to inflict irreparable injury on potentially hundreds of Black voters who go to vote at the Community Center on Election Day.

**PARTIES**

9. Plaintiff BEAUMONT BRANCH OF THE NAACP ("Beaumont NAACP") is a subsidiary organization of the Texas NAACP. The Beaumont NAACP works to ensure the political, educational, social, and economic equality of all persons and to eliminate racial hatred and racial discrimination in Beaumont, including by removing all barriers of racial discrimination through democratic processes. The Beaumont NAACP was founded approximately fifty years ago. It continues to play a critical role in furthering the work of civil rights in Southeast Texas today.

10. Since its founding, the Beaumont NAACP has used litigation, policy advocacy, community organizing, and public education to ensure the political equality of all Texans. To achieve its mission, the Texas NAACP engages in voter education, registration, mobilization, and other civic engagement activities.

11. The Beaumont NAACP is based in Beaumont, Texas in Jefferson County. It has

more than 600 registered members, including a youth group and its college membership. A large portion of the Beaumont Branch's members are registered to vote. The Beaumont NAACP's membership is more than 90% Black.

12. This election cycle, the Beaumont NAACP has worked tirelessly to register voters in the Beaumont community. The Beaumont NAACP held several voter registration events, including a number of "Pews to the Polls" events in conjunction with local churches. The Beaumont NAACP also released a commercial on the local radio station, 102.5, encouraging people to get out the vote, and posted reminders and encouragement to vote on its webpage, its Facebook page, and the like. Many members of the Beaumont NAACP also serve as poll workers, poll watchers, voter assistants, and campaign workers for different campaigns in Jefferson County.

13. The Beaumont NAACP strongly encourages its members to vote at the John Paul Davis Community Center and the Theodore Johns Branch Library because these polling places are in their communities. These polling places have also traditionally been safe, peaceful, and welcoming places for Beaumont NAACP's members to vote.

14. Numerous members of the Beaumont NAACP have been or will be harmed by the voter intimidation practices at the John Paul Davis Community Center and the Theodore Johns Branch Library.

15. Plaintiff JESSICA DAYE, a resident of Texas, is a registered voter in Jefferson County. Plaintiff Daye usually votes at the Community Center. She went to vote there on November 2. When she was in line to vote, she saw an elderly Black voter who was just a few feet ahead of her in line check in to vote with a Black poll worker who cleared her by verifying the voter's information. The elderly Black voter moved down the table to where a White poll worker stood and aggressively asked the elderly Black voter to show him her identification again and

recite her address out loud to him. After witnessing this incident, Daye immediately exited the line and left the Community Center without voting. Daye did not want to be subjected to the treatment she had witnessed, so she left. She would like to vote at the Community Center because it is close to where her mother lives and she takes care of her mother on a daily basis. But Daye plans to try to vote somewhere else on Election Day because she fears that—among other things—the poll workers at the Community Center will ask her to recite her address out loud in front of everyone.

16. Defendant JEFFERSON COUNTY is a governmental entity created under the laws of the State of Texas. It is liable for the acts and omissions of its officials, acting on behalf of the County, to conduct elections.

17. Defendant JEFFERSON COUNTY COMMISSIONERS COURT is the governing body of Jefferson County, created under the laws of the State of Texas. Tex. Const. art. V, § 18. It is liable for the acts and omissions of its officials, acting on behalf of the County, to conduct elections.

18. Defendant MARY BETH BOWLING is the presiding judge at the John Paul Davis Community Center appointed by the Republican Party. During early voting in Jefferson County, which took place from October 24 to November 4, Defendant Bowling was appointed a "deputy early voting clerk." Tex. Elec. Code § 83.031. The deputy early voting clerk "has the same authority as the early voting clerk in conducting early voting, subject to the early voting clerk's supervision." *Id.* In turn, the early voting clerk generally "has the same duties and authority with respect to early voting as a presiding election judge has with respect to regular voting." *Id.* § 83.001. Thus, during early voting, Defendant Bowling generally exercised the powers of a presiding judge. Absent relief, Bowling will also be a presiding judge on election day at the Community Center. As the presiding judge, Defendant Bowling is "in charge of and responsible

for the management and conduct of the election at the polling place of the election precinct that the judge serves." Tex. Elec. Code § 32.071.  The presiding judge "designate[s] the working hours of and assign[s] the duties to be performed by the election clerks serving under the judge." *Id.* § 32.031. The presiding judge is also charged with "preserv[ing] order and prevent[ing] breaches of the peace and violations of th[e] code in the polling place." *Id.* § 32.075. Defendant Bowling is sued in her official capacity only.

19.     Defendant LAURIE LEISTER is the county clerk of Jefferson County. A county clerk for the general election for state and county officers "may remove, replace, or reassign an election clerk who causes a disruption in the polling location or willfully disobeys the provisions of this code" following "an oral warning to the election clerk and with the concurrence of the county chair of the same political party with which the election clerk is affiliated or aligned." Tex. Elec. Code § 32.034(f). She is sued in her official capacity only.

## JURISDICTION AND VENUE

20.     This action is brought under 42 U.S.C. § 1983 and the Fourteenth and Fifteenth Amendments to the United States Constitution.

21.     The Court has subject matter jurisdiction of this action under 28 U.S.C. § 1331, as this case arises under the laws of the United States, and under 28 U.S.C. § 1343(a)(4), as this case seeks equitable and other relief pursuant to an Act of Congress providing for the protection of the right to vote, namely 52 U.S.C. § 10307(b).

22.     This Court has jurisdiction to grant both declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

23.     This Court has personal jurisdiction over Defendants who are sued only in their official capacities as officials serving in the State of Texas. Defendants are appointed officials

charged with the conduct of elections in Jefferson County, including in the City of Beaumont. The violations complained of arise from Defendants' actions in their official capacity.

24. Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred and will occur in this judicial district. Plaintiffs are located in this judicial district.

## STATEMENT OF FACTS

### I. Background

25. According to the 2020 Census, Jefferson County has a population of 256,526, 34.4% Black and 58.6% White. The City of Beaumont is located in the northeast corner of the County. Its population according to the 2020 Census is 114,586, 45% Black and 43.5% White. The North End of Beaumont, where the Community Center is located, is a neighborhood of several thousand people. The North End is a predominantly Black neighborhood.

26. The John Paul Davis Community Center sits in the heart of the North End of Beaumont, a historically and predominantly Black neighborhood. Because of its central location, its proximity to the Borden Chapel Missionary Baptist Church, and its communal atmosphere, the Community Center is a preferred voting location for Black voters in the North End. The voting population the Community Center typically serves is approximately ninety percent Black and ten percent White.

27. Countywide elections in Jefferson County are historically very close. While the county is politically split fairly evenly, votes from Beaumont, including the North End, tend to be heavily Democratic. For example, in 2018, in the countywide elections for County Judge, County Clerk, and County Treasurer—positions that will be on the ballot in 2022—the winning candidate received less than 51 percent of the vote and the losing candidate received more than 49 percent

of the vote. Citywide elections are often similarly tight in Beaumont. In 2021, for example, the Beaumont mayor's race was decided by just over 600 votes out of more than 16,700 cast.

    28.    This election cycle brought several significant changes to Jefferson County's voting setup.

    a. First, Jefferson County acquired new voting machines that are being used for the first time in this election. These new voting machines make voting in Jefferson County a two-step process: a voter must select the candidates they want to vote for on a touch-screen voting machine and then collect a printed ballot showing their selections from that machine; then, the voter must take the print-out of their filled-out ballot and feed it into a scanning machine in a different area of the polling place. If the voter does not scan their completed ballot into the machine, their vote does not count. Since voters are not yet familiar with the County's new equipment, they are more reliant on poll workers' guidance than in previous cycles.

    b. Second, this cycle marks the first general election when several new statewide election policies are in effect, following the passage of an omnibus elections bill in September 2021 known as "Senate Bill 1" or "SB 1." SB 1's provisions changed nearly every step of the voting process in Texas from voter registration to casting a mail-in ballot, but it made especially substantial changes to the powers allocated to election judges and poll watchers. Pursuant to these provisions, poll watchers now have the right to move freely around a polling place and to be near enough to see and hear the election activity they're trying to observe within the polling place. Moreover, poll watchers may not be denied free movement where election activity is occurring within a polling place. And election judges are subject to expanded

       criminal offenses if they take action to obstruct the view of a poll watcher or distance the poll watcher from an activity or procedure within the polling place. These changes have brought attention to the role of poll watchers, bringing newly trained poll watchers into polling places and more poll watchers overall.

    c. Third, the Jefferson County Commission appointed a new County Clerk, Defendant Laurie Leister, in December 2021. Defendant Leister's appointment came after longtime County Clerk Carolyn Guidry decided to resign after 16 years in the post, and her interim successor Theresa Goodness resigned shortly thereafter after 34 years in the County Clerk's office. Leister was appointed to serve as a temporary County Clerk on an interim basis. The County Commission's vote to appoint Leister was initially delayed after Leister told the Commission that she was unfamiliar with changes to the election law. Leister is not experienced in election administration.

29.   This year, early voting at the Community Center began on October 24 and ended on November 4. The Community Center is a single building surrounded by a parking lot and some grassy areas. The polling place inside the Community Center is set up as follows:

    a. The voter enters through the front door and turns right. Three tables are pushed together to form one check-in table that is set up to the right of the main entrance. There have been typically six election workers seated at the long check-in table, including (i) a Republican presiding judge and two poll workers from the presiding judge's party, and (ii) an alternate presiding judge and two poll workers from the alternate presiding judge's party. At the Community Center, Defendant Bowling serves as the presiding judge. As such, she is responsible for managing the full

    conduct of elections at the Community Center. In the event that the regularly appointed presiding judge cannot serve, the alternate presiding judge serves as presiding judge for the election. Tex. Elec. Code § 32.001(b).

b. There are two poll books or poll pads at the check-in table. Two election workers sit with a poll book at the check-in desk during voting hours. Each election worker checks voters in one at a time. There is typically one Republican election worker and one Democratic election worker at the table checking voters in. During the check-in process, the voter is asked to produce identification, confirm their residence has not changed, sign in, and then take their ballot to a voting machine.

c. The voting machines in the Community Center are set up about three to four feet away from the check-in desk. After being checked in, the voter usually walks away from the check-in desk to the back of the room to get to the voting machines. There are four voting pods, each containing a machine. None of the pods have curtains, instead they have small blinders on either side of each machine.

d. Once a voter marks their entries using the touch screen on the voting machine, the machine prints out a marked ballot. The voter then takes the ballot and walks to the ballot scanner located on the opposite side of the room, to the left of the main entrance. The voter feeds the ballot into the scanning machine in order to cast his or her vote. Then the voter exits out the front door.

e. Between two and four poll watchers are typically at this location at any given time, one to two from each party. During early voting, the poll watchers typically stood between two and four feet behind the election workers sitting at the check-in desk. Sometimes the poll watchers sat by the ballot scanner on the opposite side of the

room. Other times, the poll watchers followed a voter or followed a voter and the voter's assistant as they walked over to the voting machines, voted, and then walked over to the ballot scanner.

30. The Community Center's presiding election judge, Defendant Bowling, moved around the polling place during her shifts. Sometimes Defendant Bowling sat next to the ballot scanner, but mostly she stood directly behind and above the election workers who were seated while checking voters in. She hovered over the Black election workers as they checked in voters, typically just two feet or so behind them. Defendant Bowling was at the polling place nearly every day of the early voting period. As presiding judge, she is likely to be there from the start of voting hours to the end of voting hours on Election Day.

31. Defendant Bowling and most, if not all, of the other Republican-appointed poll workers are White. The alternate presiding judge at the location is Black and most, if not all, of the Democratic-appointed poll workers are Black.

## II. Intimidating Atmosphere

32. The atmosphere at the Community Center polling place has been hostile and intimidating for Plaintiff Daye and other Black voters for the following reasons:

   **a. Requiring Black Voters to Loudly Recite Their Address In Front of Others After Voters Already Properly Checked In**

33. "Before a voter may be accepted for voting, an election officer shall ask the voter if the voter's residence address on the precinct list of registered voters is current and whether the voter has changed residence within the county." Tex. Elec. Code § Section 63.0011(a).

34. After determining that the voter is registered, the voter must be asked if the residence address on the list of registered voters has changed. *See* Elections Div. of the Office of the Tex. Sec'y of State, *The Qualifying Voters on Election Day 2022 Handbook for Election*

*Judges and Clerks*, at 22. The address on an acceptable form of photo ID or, if applicable, a supporting form of identification with a Reasonable Impediment Declaration, should not be compared to the address on the list of registered voters, as these two addresses do not have to match. *Id.*

35. Throughout early voting, Defendant Bowling stood behind the election clerks responsible for checking voters in. She frequently asked to look at Black voters' identification, even though these voters had already been verified and checked in to vote in accordance with the guidelines above. Defendant Bowling then often asked the Black voters in question to recite, out loud and within earshot of numerous others within the polling place (including poll workers, other election workers, and other votes), their addresses. Defendant Bowling did not ask White voters who had been checked in by an election worker to show her their identification and recite their addresses.

36. The other election worker who sat at the check-in desk also asked Black voters to recite, out loud and within earshot of numerous others, their addresses even after these voters had been properly checked in. Plaintiff Daye witnessed this when a White Republican election worker asked an elderly Black voter, who had already been checked in by a Black election worker, to take out her identification again and recite her address out loud. After witnessing this incident, Plaintiff Daye decided not to vote at the Community Center and left altogether.

37. Defendant Leister was informed and was aware that Defendant Bowling and other election workers were asking Black voters to recite their addresses out loud. Defendant Leister did not take action to remove Defendant Bowling. Defendant Leister, as the county election clerk, did not direct Defendant Bowling to instruct the election workers not to engage in this type of conduct.

**b. Following Black Voters Around in the Polling Place**

38. On one occasion, Defendant Bowling followed a Black voter and a Black voter assistant to a voting machine. Defendant Bowling stood two feet away from the voter and the voter assistant and hovered over their shoulders as if looking to see who he would cast his ballot for. Only when he was repeatedly told by the voter assistant that she could not watch the voter make his selections did Ms. Bowling move away from the voter and his assistant.

39. At least two White poll watchers mimicked this behavior, following Black voters around the Community Center and sometimes standing as close as two to three feet behind voters, including while voters were at the voting machines marking their ballots.

40. Throughout the early voting period, White voters came and voted at the Community Center, but at no point were they treated this way. No White voters were followed around the polling place, hovered over while they made their selections on the voting machine, or crowded as they fed their ballots into the scanning machine.

41. Defendant Leister was informed and was aware that Defendant Bowling and other election workers were closely following Black voters around the polling place. Defendant Leister did not take action to remove Defendant Bowling. Defendant Leister did not direct Defendant Bowling to instruct the election workers not to engage in this type of conduct.

c. **Showing White Voters How to Scan Their Voted Ballots But Not Black Voters**

42. Most of the time during early voting, at least one election worker under Defendant Bowling's supervision or poll watcher from Defendant Bowling's political party sat or stood next to the ballot scanner. Many voters needed help with the ballot scanner because it was a new machine that Jefferson County voters had never used before.

43. When a White voter needed help scanning a voted ballot into the ballot scanner, Defendant Bowling, a White election worker, or a White poll watcher routinely helped the White

voter.

44. When a Black voter needed help scanning a voted ballot into the ballot scanner, Defendant Bowling, a White election worker, or a White poll watcher rarely provided this type of assistance. Black voters typically had to receive assistance from one of the Black election workers if they were around or a voter assistant if the Black voter was eligible to receive assistance and had brought one with them.

45. Sometimes Black voters did not receive the help they needed to scan their ballots in because the other Black election workers were busy checking in and helping other voters.

46. At no point did Defendant Leister take action to stop Defendant Bowling or any of the other election workers in the polling place for the differential treatment they provided to White voters and Black voters in assisting with the new ballot scanning machine.

## CAUSES OF ACTION

### COUNT I
### 52 U.S.C. 10307(b)
### Violation of Section 11(b) of the Voting Rights Act
### Voting Intimidation

47. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if set forth fully herein.

48. Section 11(b) of the Voting Rights Act creates a private right of action on behalf of one who is intimidated, threatened, or coerced while attempting to exercise his or her right to vote. Section 11(b) of the Voting Rights Act specifically provides as follows:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of Title 42.

14

U.S.C. § 10307(b).

49. Defendants have engaged in a pattern and practice of intimidating voters at the Community Center by asking voters to recite their addresses out loud once voters have already been checked in, by closely following voters and their assistants around the polling place, and by neglecting to assist Black voters in feeding their ballots into the ballot scanning machine.

50. This conduct will intimidate voters who plan to vote at the Community Center on Election Day. Unless and until enjoined by this Court, Defendants will continue to violate Section 11(b) of the Voting Rights Act, thereby preventing eligible voters—including Plaintiffs—from exercising their constitutional right to vote, causing them irreparable harm.

51. Plaintiffs have no other adequate remedy at law.

## COUNT II
## 42 U.S.C. § 1983
## Violation of the Fourteenth and Fifteenth Amendments
## Discriminatory Intent

52. The Fifteenth Amendment prohibits any state or political subdivision from denying a person his or her right to vote on account of race, color, or previous condition of servitude. U.S. Const. amend. XV.

53. The Fourteenth Amendment prohibits any governmental entity from denying a person within its jurisdiction equal protection of the laws. U.S. Const. amend. XIV, § 1. When a governmental entity discriminates based on race, strict scrutiny is triggered, and the entity must demonstrate both that the challenged practice or policy serves a compelling state interest and that it is necessary or narrowly tailored to serve that interest. Any governmental action classifying citizens on the basis of race is by its "very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Shaw v. Reno*, 509 U.S. 630, 643 (1993)

(quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)).

54. The facts clearly demonstrate that Defendant Ms. Bowling and other white election workers serving at the Community Center treated Black voters, and Black voters only, in a manner that was different from their treatment of White voters.

55. These practices do not serve a compelling interest and are not necessary or narrowly tailored to serve any compelling interest.

56. Unless and until enjoined by this Court, Defendants will continue to violate operate the Community Center with racially discriminatory intent, thereby preventing Black voters like Plaintiffs from receiving equal treatment while trying to exercise their constitutional right to vote. This will cause Plaintiffs and others similarly situated irreparable harm. Plaintiffs have no other adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff(s) respectfully pray that this Court enter an order:

I. Declaring the actions of Defendant Bowling and election clerks supervised by Defendant Bowling in violation of Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b) for creating an intimidating atmosphere for voters in the polling place;

II. Declaring the actions, as described above, of Defendant Bowling and election clerks supervised by Defendant Bowling in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution, which prohibit the targeting of a group based on their race;

III. Declaring the actions, as described above, of Defendant Leister in failing to remove Defendant Bowling and election clerks supervised by Defendant

        Bowling from their posts after learning of their intimidating behavior in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution which prohibit the targeting of a group based on their race;

IV. Directing Defendants to take such other measures as are necessary to ensure that Plaintiffs and similarly situated qualified voters may engage in the lawful exercise of the franchise free from intimidation, threats, or coercion moving forward at any polling place in Jefferson County moving forward;

V. Temporarily, preliminarily, and permanently enjoining Defendants from engaging in conduct intimidating Plaintiffs and other voters at any polling place in Jefferson County moving forward;

VI. Plaintiffs further request that the Court grant such other and further relief as may be just, including awarding Plaintiffs' costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

DATED this 7th day of November 2022.

        /s/ Jeff Homrig
        Jeff Homrig
        Nathaniel D. Bass
        LATHAM & WATKINS LLP
        301 Congress Avenue, Suite 900
        Austin, Texas 78701
        Tel: (737) 901-7300
        Email: jeff.homrig@lw.com
                nat.bass@lw.com


        Sadik Huseny*
        LATHAM & WATKINS LLP

505 Montgomery Street
San Francisco, California 94111
Tel: (415) 395-8116
Email: sadik.huseny@lw.com

*Application for admission *pro hac vice* forthcoming


Jon Greenbaum*
Ezra D. Rosenberg*
Pooja Chaudhuri*
Sofia Fernandez Gold*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street, Suite 900
Washington, DC 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org
sfgold@lawyerscommittee.org

*Applications for admission *pro hac vice* forthcoming

*Attorneys for Plaintiffs Beaumont Chapter of the NAACP and Jessica Daye*