IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| BEAUMONT CHAPTER OF THE NAACP AND JESSICA DAYE, | § § § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § § | |
| JEFFERSON COUNTY, TEXAS; JEFFERSON COUNTY COMMISIONERS COURT; ROXANNE ACOSTA-HELLBERG, *in her official capacity as the Jefferson County Clerk*; AND MARY BETH BOWLING, *in her official capacity as the Presiding Judge of the John Paul Davis Community Center*, | § § § § § § § § § § | CIVIL ACTION NO.  1:22-CV-00488 JUDGE MICHAEL J. TRUNCALE |
| *Defendants*. | § | |

## <u>ORDER AND OPINION GRANTING DEFENDANTS' MOTION TO DISMISS</u>

Before the Court is Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Pursuant to 12(b)(1) and 12(b)(6). [Dkt. 40]. For the reasons discussed below, the Court grants Defendants' motion, and dismisses Plaintiffs' case, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## I.    BACKGROUND

The Beaumont Chapter of the NAACP and Jessica Daye (collectively, "Plaintiffs") allege that black voters were intimidated and discriminated against at the John Paul Davis Community Center ("Community Center") in Beaumont during the early voting period of the 2022 general election.[1] Their Amended Complaint is largely comprised of allegations that Beaumont NAACP member, Airon Reynolds, Jr., heard from members of his church, and allegations from unidentified

---

[1] Beaumont is located in Jefferson County, Texas.

sources that involve unidentified black voters who are not named plaintiffs and, to the Court's knowledge, are not Beaumont NAACP members.

According to the Amended Complaint, Mr. Reynolds received complaints during early voting about conduct at the Community Center. These complaints purportedly alleged that white poll workers repeatedly asked black voters to recite their addresses aloud within earshot of other voters; that white poll workers *and watchers*[2] followed black voters around the polling place, including one that stood two feet behind a black voter and his voting assistant while the voter cast his ballot; and that white poll workers helped white voters scan their marked ballots into ballot scanning machines while neglecting to help black voters. [Dkt. 32 at 2]. Mr. Reynolds primarily attributes this conduct to Defendant, Mary Beth Bowling, the Republican-appointed presiding judge at the Community Center for the 2022 election. *See id.* at 7, 14.

On October 27th, Mr. Reynolds reported these complaints to the county judge, Jeff Branick. Judge Branick informed Mr. Reynolds that he did not have supervisory authority over the poll workers, as that is within the county clerk's purview. *Id.* at 14. The following day, Mr. Reynolds went to the Community Center to inform Ms. Bowling that asking black voters "to recite their addresses aloud and publicly was intimidating," and to ask her to "stop the intimidating conduct" and to "adjust her behavior" when speaking with black voters. *Id.* Ms. Bowling allegedly refused, so Mr. Reynolds contacted then-county clerk, Laurie Leister, apprised her of the situation,

---

[2] Poll *watchers* are people appointed under the Texas Election Code to "to observe the conduct of an election on behalf of a candidate, a political party, or the proponents or opponents of a measure." Tex. Elec. Code Ann. § 33.001. Poll watchers "may not be denied free movement where election activity is occurring within the location at which the watcher is serving," *id.* § 33.056, with the exception that poll watchers "may not be present at the voting station when a voter is preparing the voter's ballot or is being assisted by a person of the voter's choice." *Id.* § 33.057(b). "A presiding judge may not have a watcher duly accepted for service . . . removed from the polling place for violating a provision of this code or any other provision of law relating to the conduct of elections, other than a violation of the Penal Code, *unless the violation was observed by an election judge or clerk*." *Id.* § 32.075(g) (emphasis added).

and asked her to remove Ms. Bowling from her position as the presiding judge. *Id.* at 15. Ms. Leister denied his request. *Id.*

A few days later, on October 31st, Mr. Reynolds went to the Community Center to vote himself. *Id.* at 19. The Amended Complaint alleges that when he arrived at the Community Center, two white poll workers "suspiciously look[ed] at him," "watch[ed] every step he took," and "stood about five feet behind [him] as he proceeded through the Community Center and cast his ballot." *Id.* Mr. Reynolds allegedly "felt intimidated" but apparently otherwise casted his vote without issue. *Id.* He presented his concerns to Defendant, the Jefferson County Commissioner Court, on November 1st, but Judge Branick again expressed that this is outside his jurisdiction. *Id.* at 15.

The next day, Ms. Daye—the only named individual plaintiff in this case—went to the Community Center to vote. *Id.* at 17. Ms. Daye is the elected Democrat precinct chair for a different precinct in Jefferson County.[3] [Dkt. 5]. While in line to check in, Ms. Daye observed a black voter check in, which included confirming her address and signing the poll pad. [Dkt. 32 at 17–18]. The voter then proceeded to the poll worker who directs voters to machines to cast their vote. *Id.* at 18. Ms. Daye alleges that the poll worker then asked the voter to take out her identification and recite her address aloud. *Id.* According to Ms. Daye, the poll worker appeared to be "attacking" the voter, "as if she was lying about her identity." *Id.* Ms. Daye was allegedly "so alarmed and frustrated" after witnessing this interaction that she "immediately decided not to vote at the Community Center and left." *Id.*

Then, on the eve of Election Day—November 7, 2022—at 1:33 p.m., Plaintiffs petitioned this Court for an emergency temporary restraining order. [Dkt. 3]. They alleged that Defendants' conduct violated Section 11(b) of the Voting Rights Act, the Fourteenth Amendment, and the

---

[3] Voters do not have to vote in their precinct on Election Day. [Dkt. 32-4 at 3].

Fifteenth Amendment, and requested that the Court: (1) prohibit Ms. Bowling from serving as the presiding election judge or in any capacity at a polling location on Election Day; (2) prohibit all election judges, clerks, workers, volunteers, or watchers at the Community Center from: (a) requesting or ordering voters to publicly recite their addresses before allowing them to vote; (b) positioning themselves so that they could view voters' ballots; (c) refusing to assist voters in scanning their completed ballots; and (d) turning away voters who are duly eligible to vote for any reason; and (3) order Ms. Leister to send notice of the TRO, if granted. [Dkt. 3]. The Court held an emergency hearing that evening at 6:30 p.m. that lasted over three hours. [Dkt. 15]. Ms. Daye did not attend.

The right to vote is one of the most sacred privileges of American citizenship. If this invaluable right is improperly denied, no amount of compensation could provide a sufficient remedy. Given this risk of irreparable harm, the limited burden on Defendants, the public's interest in those who are entitled to vote being able to exercise that right, and the time constraint that limited the Court's ability to fully consider the novel legal issues presented, the Court ultimately granted Plaintiffs' motion for an emergency TRO in part, and made four general rulings. First, it denied Plaintiffs' request to prohibit Ms. Bowling from appearing or serving as the presiding election judge. [Dkt. 14 at 1–2]. Second, it granted Plaintiffs' request to prohibit "all election judges, clerks, workers, volunteers, or watchers at the John Paul Davis Community Center from requesting or ordering any voters to publicly recite their addresses before allowing them to vote."[4]

---

[4] "Before a voter may be accepted for voting, an election officer shall ask the voter if the voter's residence address on the precinct list of registered voters is current and whether the voter has changed residence within the county." Tex. Elec. Code Ann. § 63.0011(a). Jefferson County voters may vote at any polling location in the county. This system stimulates voter turnout and decreases the burden that voters must incur to exercise their right to vote. It is necessary, however, that poll workers confirm voters' addresses, to ensure that each voter receives the correct ballot. The parties agreed at the TRO hearing that there are several ways that a poll worker can verify a voter's address to comply with Tex. Elec. Code Ann. § 63.0011(a). For example, the poll worker could ask a voter to verify his address on the poll iPad, or ask him to confirm his house number. *See* [Dkt. 18 at 81:18–23]. Plaintiffs take issue with poll workers satisfying this requirement by asking voters to recite their address aloud.  [Dkt. 32 at 16].

*Id.* at 2. Third, it granted Plaintiffs' request to prohibit all election judges, clerks, workers, volunteers, or watchers at the Community Center from: (1) positioning themselves near voters who are marking their ballots such that they can view voters' selections; (2) refusing to assist any voters in inserting or scanning their completed ballot into the appropriate voting machine; and (3) turning away voters who are duly eligible to vote. *Id.* Fourth, the Court ordered "County Clerk Laurie Leister to send notice of this order to all affected election judges, clerks, workers, volunteers, and watchers, and to fully implement this order, no later than 7:00 a.m. Central Time on November 8, 2022." *Id.* at 3. Critical to the present motion, the Court expressly emphasized that it did not make any findings of fact before entering this TRO, and that the TRO was to expire on November 9, 2022. *Id.* at 1, 3.

Over a month after Election Day, Plaintiffs filed their Amended Complaint. [Dkt. 32]. In this Amended Complaint, Plaintiffs, for the first time, notify the Court that Defendants did not comply with the November 7th TRO. Plaintiffs apparently sent multiple emails and telephone messages to Defendants on Election Day asking them to send the required noticed, but Defendants did not oblige. *Id.* at 22. The Amended Complaint also updates the Court that Ms. Daye voted without issue on Election Day. *Id.* at 18.

## II.    LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) challenges a court's subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). A district court must dismiss a case for lack of subject-matter jurisdiction "when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits."

*Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam)). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

## III.    DISCUSSION

### A.  Plaintiffs' claims are moot.

"The doctrine of mootness arises from Article III of the Constitution, which provides federal courts with jurisdiction over a matter only if there is a live 'case' or 'controversy.'" *Dierlam v. Trump*, 977 F.3d 471, 476 (5th Cir. 2020). "Accordingly, to invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Chafin v. Chafin*, 568 U.S. 165, 171–72 (2013) (cleaned up). The "actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (internal quotation marks omitted). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* at 91. (internal quotation marks omitted).

"The Supreme Court has recognized a handful of exceptions to mootness that apply in 'exceptional situations.'" *Shemwell v. City of McKinney*, 63 F.4th 480, 484 (5th Cir. 2023) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). "As relevant here, a dispute that would otherwise be moot is saved if it is 'capable of repetition, yet evad[es] review.'" *Id.* (quoting *S. Pac. Terminal Co. v. Interstate Com. Comm'n*, 219 U.S. 498, 515 (1911)). "The exception applies when (1) 'the challenged action is in its duration too short to be fully litigated prior to cessation or expiration' and (2) 'there is a reasonable expectation that the same complaining party will be subject to the

6

same action again.'" *Id.* (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016)). To overcome mootness, a plaintiff must prove both prongs. *Libertarian Party v. Dardenne*, 595 F.3d 215, 217 (5th Cir. 2010). "If a court finds that plaintiff failed to meet their burden under either prong, it need not address the other." *Shemwell*, 63 F.4th at 484–85.

As to the first prong, "[e]lection controversies are paradigmatic examples of cases that cannot be fully litigated before the particular controversy expires." *Moore v. Hosemann*, 591 F.3d 741, 744 (5th Cir. 2009). That does not mean that election controversies automatically receive a mootness get-out-of-jail-free card, however. *See Shemwell*, 63 F.4th at 485 ("While it is true that the timing of elections can create litigation challenges, neither our court nor the Supreme Court has ever created a blanket rule for election cases."). "A party usually must show its claims have evaded the review that was available for reasons beyond its control before it can ask for more." *Empower Texans, Inc. v. Geren*, 977 F.3d 367, 371 (5th Cir. 2020). "[E]xceptional circumstances justifying a court's moving beyond actual mootness will be less likely found when the party seeking review failed to utilize the procedures that had been available." *Id.* Like an unsatisfied restaurant patron who asks to not be charged for his overcooked steak after devouring it with no complaint, "[a] party seeking to continue litigation after time has run out should not be allowed to do so when it failed to use the time it had." *Id.* While seeking a temporary restraining order is one such procedure to utilize, "the obligation to be diligent [does] not end there." *Id.*

According to the Amended Complaint, all the conduct that Plaintiffs complained of when seeking the TRO occurred on or before November 2nd, 2022. Yet, Plaintiffs waited until 1:33 p.m. on November 7th—the day before Election Day—to file their Motion for Emergency Temporary Restraining Order. [Dkt. 3]. Plaintiffs' eleventh hour filing all but guaranteed that Defendants

would not have time to meaningfully respond, and that the Court would not have time to thoroughly research and consider these novel issues.

In their Amended Complaint, Plaintiffs also complain that Defendants did not comply with the Court's November 7th TRO. For reasons unknown to the Court, Plaintiffs waited over a month after Election Day to bring this to the Court's attention. The time to request the Court's intervention for Defendants' alleged disregard of the TRO was November 8, 2022. Instead, Plaintiffs waited until December 13, 2022, when they filed their Amended Complaint.[5]

The only basis Plaintiffs provide to satisfy the first mootness prong is that "there is no question that the challenged conduct in any given election, which relates to in-person voting, is too short to be fully litigated before that election ceases." [Dkt. 43 at 25]. They reason that early voting in Texas begins no earlier than the 17th day before Election Day, so even if misconduct began on the first day of early voting, they could not have fully litigated their case before Defendants were required to serve a responsive pleading. *Id.* (citing Tex. Elec. Code Ann. § 85.001(a); Fed. R. Civ. P. 12(a)(1)).

True, election controversies often cannot be fully litigated before the controversy expires. Plaintiffs provide no explanation, however, for not seeking a TRO until less than twenty-four hours before the polls were set to open on Election Day. Plaintiffs also provide no explanation for why they waited over a month after Election Day to amend their complaint and to, for the first time, notify the Court of Defendants' failure to comply with the TRO. There is no blanket rule that automatically shields Plaintiffs from their claims being rendered moot, simply because this is an election controversy. *See Shemwell*, 63 F.4th at 485. To meet their burden under the first mootness

---

[5] December 13th happens to also be the day that would have been Plaintiffs' deadline to respond to Defendants' then-pending motion to dismiss, [Dkt. 31], had Plaintiffs not filed their Amended Complaint that day, which mooted Defendants' motion.

prong, Plaintiffs needed to show the Court that they diligently pursued their claims but that, due to reasons entirely out of their control, the claims nonetheless evaded review. *Empower Texans, Inc.*, 977 F.3d at 371. Their failure to do so renders their claims moot.

## B.  Even if Plaintiffs' claims were not moot, neither Jessica Daye nor the Beaumont NAACP has standing.

The doctrine of constitutional standing is also rooted in Article III's case or controversy requirement. It "assures that 'there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party.'" *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974)). "Where that need does not exist, allowing courts to oversee legislative or executive action 'would significantly alter the allocation of power . . . away from a democratic form of government.'" *Id.* (quoting *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring)).

"In order to have constitutional standing, a plaintiff must establish (1) an injury in fact that is (2) fairly traceable to the challenged action of the defendant and (3) redressable by a favorable ruling." *Fusilier v. Landry*, 963 F.3d 447, 454 (5th Cir. 2020). "Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements." *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019). "Because injunctive and declaratory relief 'cannot conceivably remedy any past wrong,' plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury." *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998)). "That continuing or threatened future injury, like all injuries supporting Article III standing, must be an injury in fact." *Id.* (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). "To be an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) concrete and particularized, not abstract; and (3) actual or imminent, not

conjectural or hypothetical. *Id.* at 720–21 (internal quotation marks and citations omitted). "The purpose of the requirement that the injury be 'imminent' is 'to ensure that the alleged injury is not too speculative for Article III purposes.'" *Id.* at 721 (quoting *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013)). "For a threatened future injury to satisfy the imminence requirement, there must be at least a 'substantial risk' that the injury will occur."[6] *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 158); *see also Chang v. United States*, 738 F. Supp. 2d 83, 90 (D.D.C. 2010) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)) ("[R]egardless of the existence of an unlawful policy, a plaintiff must show that he is sufficiently likely to be *personally* subjected to the challenged conduct *again* in order to have standing.") (emphasis added). "In other words, 'past wrongs' do not 'themselves amount' to the kind of 'real and immediate threat' of future injury 'necessary to make out a case or controversy' for a claim seeking only equitable relief." *Mich. Welfare Rights Org. v. Trump*, 600 F. Supp. 3d 85, 108 (D.D.C. 2022) (quoting *Lyons*, 461 U.S. at 103) (holding that the NAACP lacked standing to bring a claim under Section 11(b) of the Voting Rights Act).

"An association or organization can establish an injury-in-fact through either of two theories, appropriately called 'associational standing' and 'organizational standing.'" *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). Associational standing exists if: "(1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3)

---

[6] This is distinct from the "capable-of-repetition-yet-evading review" exception to the general rule that federal courts do not have jurisdiction over *moot* cases. "The capable-of-repetition-yet-evading-review doctrine applies only to claims that are moot, *i.e.* presented a case or controversy when they were filed but ceased to do so at a later time." *Stringer*, 942 F.3d at 724. There is no analogous exception to standing requirements: "if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum." *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000)); *see also Friends of the Earth*, 528 U.S. at 190 ("The plain lesson . . . is that there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness.").

neither the claim asserted nor the relief requested requires participation of individual members." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). "By contrast, 'organizational standing' does not depend on the standing of the organization's members. The organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'" *OCA-Greater Hous.*, 867 F.3d at 610.[7] Here, the NAACP relies on associational standing.

In *Summers v. Earth Island Institute*, the Supreme Court flatly rejected a test for associational standing that would look to "whether, accepting the organization's self-description of the activities of its members, there is a statistical probability that some of those members are threatened with concrete injury." 555 U.S. at 497. The Court proclaimed that such an approach "would make a mockery of [the Supreme Court's] prior cases, which have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.* at 498.

Where multiple plaintiffs in a case seek the same injunctive relief, "one plaintiff's successful demonstration of standing is sufficient to satisfy Article III's case-or-controversy requirement." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 178 (5th Cir. 2020) (internal quotation marks omitted).

Few facts in the Amended Complaint actually involve Plaintiffs. As to Ms. Daye, the Amended Complaint merely alleges that she overheard a poll worker ask a black voter for her address after the voter was already checked in, and that Ms. Daye was "so alarmed and frustrated" by this that she "immediately decided not to vote at the Community Center and left," and voted on

---

[7] The Court is aware that courts have used these terms interchangeably in the past, so attention must be paid to substance over form when reviewing opinions that discuss organizational and associational standing. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 494–95 (2009) (using the term "organizational standing" to refer to organizations asserting the standing of their members).

Election Day instead. [Dkt. 32 at 17–18]. According to the Amended Complaint, Ms. Daye "plans to vote in future elections and wishes to be treated with respect and free from intimidation when voting at any polling places in Jefferson County." *Id.* These are the only facts alleged in the Amended Complaint that involve Ms. Daye.

Plaintiffs also allege that Beaumont NAACP member, Airon Reynolds, Jr., "felt intimidated" by two white poll workers who "suspiciously look[ed]" at him when he arrived at the Community Center to vote, "watch[ed] every step he took," and "stood about five feet behind [him] as he proceeded through the Community Center and cast his ballot." *Id.* at 19. These are the only facts alleged in the Amended Complaint that involve a Beaumont NAACP member. While several other allegations involve black voters, including members of Mr. Reynolds' congregation, Plaintiffs to do not allege that these voters are Beaumont NAACP members.

It may be true that the Beaumont NAACP need not "set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing." *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012) ("We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing."). But this is not a case where an association claims that its members suffered an injury but does not specifically name the injured members in the complaint. Here, the Beaumont NAACP does not even allege that its members have suffered the injuries that it seeks to prevent. *See generally* [Dkt. 32]; *cf. Hancock Cnty. Bd. of Supervisors*,  487 F. App'x at 198 ("[T]he NAACP branches were not merely alleging that some members *might* suffer a 'one person, one vote' violation. The NAACP branches were alleging that some members *were* suffering such a violation. By alleging that some of its members were voters from overpopulated

12

and under-represented districts, the NAACP branches adequately alleged that some of its members were suffering a concrete, particularized injury."). Instead, Plaintiffs ask the Court to proactively block Defendants from partaking in conduct that they *heard* took place during early voting for the 2022 general election, out of concern that such conduct will injure Beaumont NAACP members if it occurs during future elections, even though it did not injure them during the 2022 election. Essentially, Plaintiffs argue that because most Beaumont NAACP members are black and plan to vote in the future, statistically speaking, at least one member will likely suffer from this conduct in the future, if it continues. This is precisely what the Supreme Court rejected in *Summers*. *See* 555 U.S. at 497.

Plaintiffs' alleged future injuries are far too speculative to establish standing. Plaintiffs contend that "Defendants have engaged in a pattern and practice of intimidating voters" by: (1) asking voters to recite their addresses out loud once voters have already been checked in; (2) closely following voters and their assistants around the polling place; (3) hovering over black voters and their assistants as they selected candidates; and (4) neglecting to assist black voters in feeding their ballots into the ballot scanning machine.[8] [Dkt. 32 at 25]. Plaintiffs do not allege, however, that either Ms. Daye or a Beaumont NAACP member were: (1) asked to recite their address out loud after being checked in; (2) closely followed around the polling place; (3) hovered over while they voted; or (4) deprived of assistance when scanning their ballots.[9] Plaintiffs merely allege that Ms. Daye *overheard* a voter being asked to recite her address after having already

---

[8] While these are the allegations that Plaintiffs specifically plead for their Voting Rights Act claim, their 42 U.S.C. § 1983 claim for violations of the Fourteenth and Fifteenth Amendments is premised on the same conduct.

[9] Plaintiffs allege that poll workers *stood* about five feet behind Beaumont NAACP member, Mr. Reynolds, as he proceeded through the Community Center to cast his ballot. [Dkt. 32 at 19]. The Court notes that the Amended Complaint also provides that "[t]he voting machines in the Community Center were set up about three to four feet away from the check-in desk." *Id.* at 12.

checked in, and that Mr. Reynolds heard through the grapevine—from non-NAACP members—about such conduct occurring. Nonetheless, Plaintiffs insist that without an injunction, "Defendants will continue to violate Section 11(b) of the Voting Rights Act, thereby preventing eligible voters—including Plaintiffs—from exercising their constitutional right to vote." [Dkt. 32 at 25–26].

Given that Plaintiffs were not even subjected to this conduct during the 2022 election, the Court finds that there is not a sufficient likelihood that they will be personally subjected to it in future elections. Any such allegations are purely conjectural and hypothetical. Plaintiffs, Jessica Daye and Beaumont NAACP, lack standing to bring their claims.

## IV.    CONCLUSION

While the Court has sincere doubts about the merits of Plaintiffs' claims, it need not reach those issues.

It is therefore **ORDERED** that Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Pursuant to 12(b)(1) and 12(b)(6) [Dkt. 40] is hereby **GRANTED**. Plaintiffs' claims are **DISMISSED WITH PREJUDICE.**

**THIS IS A FINAL JUDGMENT**. The Clerk of Court is **INSTRUCTED** to close this case.

**SIGNED this 4th day of August, 2023.**

*Michael J. Truncale*
Michael J. Truncale
United States District Judge

14